UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LORI S. MIGHTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 04 C 4881 |
| | ) | |
| GLENVIEW COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 34, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Defendant Glenview Community Consolidated School District No. 34 ("Glenview") for summary judgment on Plaintiff Lori Mighty's claim of racial discrimination and the parties' cross-motions for summary judgment on Mighty's claim of unlawful retaliation. For the reasons set forth below, Glenview's motions are granted and Mighty's is denied.

**BACKGROUND**

Glenview is a school district in the northern suburbs of Chicago; the district serves children from kindergarten through eighth grade. One of the schools within the district is Springman Middle School. Mighty taught Spanish to seventh and eighth graders at Springman from January 1999 until August 2002. During this time, Mighty was the only

African-American certified staff member at Springman. She was not tenured, as teachers at Springman do not become eligible for tenure for at least four years.

Students at Springman were often taught a subject by a particular teacher for more than one grade level. For example, a student could receive math instruction from the same teacher for both seventh and eighth grade. This process was called looping. Although looping was encouraged and fostered at Springman, it did not always occur for reasons including scheduling and parent requests. Few teachers looped with every student they taught.

Mighty's troubles began during the 1999-2000 school year when she experienced difficulty with one of her students. The student used two racial slurs both inside and outside her classroom. On the second occasion, Mighty issued a detention slip to him, which he tore up in front of her. When Mighty informed the administration about these events, he was given a one-day in-school suspension. His parents objected to the punishment, and Charles Terry, the school's principal, met with his mother to discuss the situation. Terry later suggested to Mighty and others that behavior of both the parent and the child could have been racially motivated. Mighty was told that all discipline requests relating to that student would have to go through Rosemary Lorenzo, one of the assistant principals. In May 2000, the student was moved to a different Spanish class.

In December 1999, Heather Hopkins, another assistant principal, formally reviewed Mighty's performance and rated it "Satisfactory." The evaluation noted that Mighty's intense demeanor in the classroom could be intimidating and that she needed to engage parents early when she had a problem with their children in class. A second review given in April 2000 again noted the former issue, though with slightly different terminology. She was rehired for the following school year and given a raise.

Going into the 2000-2001 school year, the administration received letters from several parents requesting that their children not be placed in Mighty's classes. Some suggested that they or their students experienced difficulty in reaching Mighty or cited unresolved issues with her regarding student performance. Terry informed Mighty of these letters and their contents and required her to post times when she was available to provide extra help to her students. She was also required to email and phone correspondence with parents and to copy members of the administration on any written messages.

During the 2000-2001 school year, Springman used classrooms in a temporary building adjacent to the permanent school to alleviate overcrowding problems. Mighty was assigned during this school year to classrooms in both the temporary and the permanent building, necessitating her to walk between them during the school day. Other teachers were also assigned to multiple classrooms, some of which were more

distant from each other than Mighty's assigned classrooms. Mighty was the only teacher with rooms in both buildings.

At one point during the 2000-2001 school year, Mighty left the school campus without notifying the administration of her absence. She was contacted at home and returned to school. At a meeting that ensued, Mighty asserts that she was forbidden from leaving school grounds during the school day; Lorenzo states that she was told not to leave school grounds without first informing the office.

The parties do not highlight any specific confrontations or difficulties occurring in the 2001-2002 school year, and Mighty was reappointed with a pay raise for the following school year in April 2002. Around the same time, however, she was issued an unsatisfactory evaluation and a Professional Growth Plan for the 2002-2003 school year that once again focused attention on her relationship with her students and their parents. It provided that, during the following school year, Mighty would be required to read and discuss with an evaluator professional literature regarding parent communication and student interaction. She would be assigned a mentor and a social worker; the latter would meet with students in Mighty's absence to discuss their perceptions of her classroom. Finally, she would be required to attend various specified meetings and workshops. The plan's implementation was cut short by Mighty's

resignation in August 2002. Although the record is not clear on when she obtained new employment, Mighty now teaches at another school where she is apparently quite happy.

Mighty initially pursued relief through the EEOC and received a right-to-sue letter in May 2004. This suit, alleging racial discrimination and unlawful retaliation in violation of Title VII, followed. Upon completing discovery, Glenview moved for summary judgment on the entirety of Mighty's complaint and Mighty cross-moved for summary judgment on her retaliation claims.

**LEGAL STANDARD**

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. Proc. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth

specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant," Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record–only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

When parties file cross-motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). With these principles in mind, we turn to the parties' motions.

### DISCUSSION

Mighty's case involves two separate yet related claims: racial discrimination and unlawful retaliation. To establish her discrimination claim, Mighty must use either the

direct method or the indirect method to show that Glenview took some adverse employment action against her on the basis of her race. See Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1107 (7th Cir. 2004). For her retaliation claim, she must show that Glenview took adverse action against her because she engaged in some statutorily protected activity. See Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003). Though the two causes of action are different, they have some aspects in common, most notably that Mighty must demonstrate that Glenview took an adverse employment action against her.

In the area of employment discrimination, an "adverse employment action" is not simply anything that an employee does not like. See Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 744 (7th Cir. 2002). To underpin a viable discrimination or retaliation claim, an employer's action must be a "significant change in employment status." Burlington Indus. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268 (1998). In examining the state of the law, the Seventh Circuit has identified three categories of employer actions that fit this bill; two are potentially applicable to Mighty's case. See Herrnreiter, 315 F.3d at 744. First, an employee's job can be changed in a way that injures the employee's career. Id. Mighty claims that her inability to loop with her students did just that. Second, the conditions in which an employee works can be altered in a way that objectively creates a hardship, such as creating a "humiliating, degrading,

unsafe, unhealthful, or otherwise significantly negative" environment. Id. According to Mighty, the additional requirements placed upon her, even those that were never actually implemented because of her resignation, created such an environment.

Though Mighty relies on many perceived slights as support for her contentions, we do not agree that they are all potential candidates. With respect to her ability to loop with her students, it is undisputed that many teachers and students were unable to loop from year to year for various reasons. Moreover, Mighty insists that this impinged on her career prospects, yet she offers nothing to show that it prevented her from finding and obtaining a job that is personally and professionally fulfilling. Cf. Bryson v. Chicago State Univ., 96 F.3d 912, 916 (7th Cir. 1996) (employee presented evidence that job prospects were compromised by loss of title and committee assignments).

Mighty's reliance on the terms of the Professional Growth Plan is similarly misplaced. It is undisputed that Mighty resigned before its terms went into effect, so any assessment of their effects on her work environment would be pure speculation. Though it is clear that Mighty did not relish working under the plan, its requirements were not so patently egregious that Mighty was entitled to assume that the new requirements would make her life unbearable. See Brown v. Ameritech Corp., 128 F.3d 605, 608 (7th Cir. 1997). Anticipation of adverse effects in this type of setting is not enough to create an triable issue of fact whether an employer significantly changed an employee's status.

The remainder of the actions to which Mighty objects, even when viewed in a light most favorable to her, amount at most to minor inconveniences. See Crady v. Liberty Nat. Bank and Trust, 993 F.2d 132, 136 (7th Cir. 1993). Mighty has not made any showing that the posting of her hours and logging and copying of correspondence with parents added any significant burden of additional work or time to Mighty's workload. Neither is it an adverse action to require an employee to remain at the workplace as Mighty asserts she was told to do. Finally, Mighty makes much of the fact that she had to travel between the buildings during the school day, but she does not dispute that others were made to travel even greater distances between their classrooms. We cannot conclude that Mighty's overall environment was rendered humiliating, demeaning, unsafe, or otherwise significantly negative by this change. The same rationale applies to Mighty's retaliation claim.[1] Thus, the petty annoyances that were insufficient to show race discrimination will not support Mighty's claim for retaliation.

Consequently, we conclude that Glenview did not subject Mighty to an adverse employment action. The absence of this element means that Glenview is entitled to

---

[1] Though we recognize that the possible range of adverse actions that can support a viable retaliation claim is broader than for straight discrimination claims in that they need not arise within the employment setting, they must still be "adverse" as that term is used in an employment law setting. See Washington v. Ill. Dept. of Revenue, 420 F.3d 658, 661 (7th Cir. 2005). Furthermore, Mighty does not claim retaliation occurred outside of her workplace at Springman, so the distinction drawn in the case law between adverse actions for discrimination and retaliation claims is irrelevant here.

summary judgment on both claims of the complaint. Mighty's motion for judgment in her favor on the retaliation claim is accordingly denied.

## CONCLUSION

Based on the foregoing analysis, Glenview's motion for summary judgment on the entirety of the complaint is granted. Mighty's cross-motion for summary judgment on her retaliation claim is denied.

Charles P. Kocoras
Chief Judge
United States District Court

Dated:  February 2, 2006